It's nice you're all wearing white shirts. It's safe, too. Huh? It's a safe color. Same color, I see that, yeah, white. Well, one's out of place with a grayish tie. I forgot to make a call. Okay. I remember the days if a lawyer didn't show up in court with a white shirt, there'd be about five minutes worth of apologies. But better days are here. Go ahead. Thank you, Your Honor. If it pleases the Court, Mark Pettinieri on behalf of M2 SOFTWARE, Inc., Your Honor, this case is a trade name case. It's something that's been looked over throughout the briefing on the matter. The Lanham Act protects trademark owners from acts of infringement by someone who uses in commerce a mark where that use is likely to cause confusion or mistake or to deceive as to the affiliation, connection, or association or as to the origin, sponsorship, or approval of his or her goods. That's set forth in Section 1114 of Title 15 and 1125A. The Daystar Court in the United States Supreme Court in 2003 made it clear that the 1988 amendments to the Lanham Act included whether there was confusion as to affiliation, connection, or association and not simply origin of goods or among consumers. Here, M2 SOFTWARE, its trade name is M2 SOFTWARE, its products are branded M2 SOFTWARE, was denied the analysis of whether M2 Communications' use of M2 is likely to cause confusion as to the affiliation, connection, association, sponsorship, or approval between the parties. That happened both on summary judgment and at trial, an unlimited issue that was tried. And that's a critical point. This is not just a product that's on the market among many products that both these companies sell. These are trade names. They're actively in the same industry competing with one another in marketplace using the same name. Well, I guess that's the question, is it would lead who, whom to believe that there's affiliation. In other words, you have to look at who is being supposedly confused. Well, people will be confused at all levels of the channel. An example is my client sells three different products, a record label management system, which is designed to catalog, organize, provide reports for record label companies. He also sells a product that's been lumped together by the other side. It's a music publisher management system. It performs some of the same tasks. Both of these products, by the way, include interactive use so that you can click on a link to a song and get a clip if the companies want to use it. But the music publisher management system is sold to publishers, not record labels. Now, there's a distinction there the court needs to be aware of. When we're talking about record labels, they own the recordings. But publishers own the songs and license the intellectual property to the recording labels so that they can produce the song. For example, you might have Blue Slave Shoes, which was originally recorded by Elvis Presley, owned by a publisher who could also license it to U2 to record it today. The publisher owns the IP, the copyrights, to the songs or music that's being recorded, whereas the recording labels own the actual recordings. Slight distinction, but very important. The third thing that my client sells is content. It's not a big part of his business, but it's been there since the inception of the business. He sells recordings, and he sells them in digital arenas, on CDs, what have you, but they're not a big portion of his business. Now, you ask the question, who would be confused? Or who would be confused as to the affiliation, sponsorship, connection, association, or approval of the products being sold by my client or by the other side? Now, that's a little easier to understand when you understand that the record label companies that my client sells his record label management system to are the same companies that the defendant will sell their recordings to, their intellectual property for that song. So, for example, if a record label such as Arista wants to sell a song that is owned by a publisher from another company, it goes to that publisher to get those rights, but those rights come from the record label that owns the recording. So they could say, we want to build a compilation of songs that you've recorded and put them on our own product. They have to go to the record label to get those rights, and to the publisher if they want to do it themselves. But there's interaction between all these groups. My client, for example, a referral could happen. Somebody could say, you know, you should really get that record label management system or that music publisher management system that M2 sells. And M2 Communications is in the marketplace selling Christian music records, and that might be the only thing that the person knows. And they could say, well, I don't want any part of that. When they're really, the referral is talking about my client, who sells record label management systems and music publisher management systems. I guess the question is whether those people, the publishers and the other group, are both unlikely to confuse the two just because they're in such different lines. They're not in different areas. They're in the recording industry. They aren't. It's a level of generality. It's a level of generality that exudes this market. This market, as was pointed out by Viacom in an underlying peer court decision, was that once you're in this business, you're in all aspects of it. That's very important. My client's been in all aspects of this business since 1991, 14 years. And I think the court needs to understand that what happened below, the reason that there was no analysis of whether there was a likelihood of confusion as to affiliation, connection or association or approval or sponsorship was because the court intentionally avoided that. There was no analysis of the sleek craft factors on those points. Sleek craft is a decision by the Ninth Circuit that said when we have competition between two parties who are selling the same goods to the same purchasers, all we have to look at is to determine whether there is a similarity of marks. If there's a similarity of marks between those two companies selling the same products to the same people, there's confusion. There's a likelihood of confusion. But what do we do when there's complementary goods and services? What do we do when you're talking about human food versus pet food? Or what about photography supplies and offset printing? Related goods and services being offered by two different companies under the same brand have to be analyzed very carefully. And the Ninth Circuit said in sleek craft that several factors are added to the calculus, and they started with eight, I believe. Strength of the mark, proximity of the goods, similarity of the marks, evidence of actual confusion, marketing channels that are used by the parties, the type of goods and degree of care exercised by the purchaser of the goods and services, and the likelihood of expansion of the product lines. And when you analyze all of these factors correctly, you'll find that the case shouldn't have been handled the way it was. The first factor that's most important is that the strength factor. In the court below, they considered M2 software sales and advertising. If I understand your brief, your initial position is you don't even get to the sleek craft factors. Initially, if you consider the products competing with one another, that's correct. Now your fallback is sort of, but if you get to the sleek craft. It's not a fallback. I think there's a lot of issue in the briefing here as to whether there are competition between the two. I think that M2 Communications is focusing entirely on the fact that all they do is sell Christian music recordings. And since my client's content media is a little different from Christian music recordings, there can't be any confusion. What they fail to recognize is that there are complementary goods and services being offered by my client, and the expansion likelihood of M2 Communications. So there might be some, in your view, there might be some things that are directly competing, and then there are some things that are related. Is that? There are complementary or related goods, yes. Okay. And to the extent that they're identical recordings, yes, they would be. My client, for example, sold some of his management and administration services to Reunion, which also sells Christian music. At one point, there was overlap between these two companies. But the point is that when you analyze the sleek craft factors correctly, the court below made error. And the first issue is strength. A major problem happened there. First, the court was relying on a decision entered by the district court in the M2 v. Viacom case, which was reversed on appeal after the court's ruling on summary judgment below. But the court refused to reconsider its ruling in light of the Ninth Circuit's opinion. This court ruled that it was error on the ruling of the preliminary injunction matter. When it came up to this court at that point, this Court ruled that it was error when dealing with the appeal from the denial of the preliminary injunction to consider sales and advertising in determining the strength of the mark. And interstellar, this Court also dealt with the issue of an appeal on summary judgment where that matter, where that issue was presented. And the Court said that it should cut against the grant of summary judgment because the widest ambit of protection should be applied to a fanciful mark. There's no dispute here that M2 is a fanciful mark. Let's not get anything confused in that respect. M2 is not a generic mark. It's not descriptive of any goods and services. It's not suggestive of any goods and services. It is not arbitrary. It is fanciful. And that's key. Nobody disagrees with that. Not even the court below disagreed with that. But what the court below did is said, you don't want to do that. M1, you know, that was a rifle. There's an M2, an M14, an M16. You're aware of that, aren't you? M&Ms are candy. M&Ms are candy. Well, we're not talking about rifles or chocolate candy. And there are instances in which you can have the same marks addressing different goods and services that are so unrelated there cannot be confusion. And if you want to stop that because your mark is so strong, then you attack the other side under the dilution statute, which is a state statute only recently adopted in 43C, which is 1125C, I believe. But dilution looks at the famousness of the mark, the strength of the commercial setting in which it's used, not trademark analysis. Trademark analysis looks at the strength of the mark on the continuing continuum of trademark strength, i.e., fanciful, arbitrary, suggestive, descriptive, generic, generic being given no protection, fanciful being given the strongest protection allowed. When you reach marks that are descriptive or suggestive in some cases, then you turn to the marketplace to see whether there is any distinctiveness that's been attributed to that mark from the marketplace. The issue is a trademark should be distinctive. Breyer, through advertising. Advertising or sales or commercial success. In other words, its presence out there. Has the public come to adopt it in secondary meaning applied to the mark? Marks such as American Airlines. When it originally started, it's very descriptive. It's American Airlines. But it can acquire trademark protection through its use in the marketplace. Statutorily, it can be an application filed under 2F after so many years of use in commerce within the marketplace. But what the court – when the court analyzes a trademark infringement analysis to determine the likelihood of confusion between two marks that may not be competing with one another in goods and services, but they're related goods and services, the court has to look at is the mark's strength fanciful or is it generic. And when it does so, if it's a descriptive or suggestive mark, then it can turn to the commercial issues, to the marketplace, to find out whether or not it has gained strength. Because the mark's existence. Look at both, the conceptual and what the marketplace is. Only if the mark is descriptive or suggestive in some cases. If the mark is fanciful, you need not do that. It can't get any stronger than it is. The only time you would ever look at the commercial or marketplace significance of a mark is in the dilution statute. When you're saying, I'm Coca-Cola and I don't care if that's an automobile, I want to stop you. Because you can't use my trademark for automobiles, even though I only sell soft drinks. Coca-Cola can do that because its mark is so strong, so famous, that when that automobile is named Coca-Cola, everybody will think it's affiliated with Coca-Cola in Atlanta, Georgia. But that is for rare instances in special marks that have achieved that level of famousness. The courts are very clear that you should not, you should not do that analysis for a mark that has a fanciful or arbitrary quality to it already. You don't have to. Because it already has inherent distinctiveness. You don't have to go looking for it. You don't have to look at the conceptual strength, the way the letters are and all that. You look at the conceptual strength, i.e., is it fanciful or arbitrary? But you don't look at the commercial strength. It's irrelevant that my client's sales over 14 years of recordings has been de minimis in the eyes of the defendant or in the eyes of M2 Communications. They just don't have $600 million to throw at artists to make songs. That's not a problem. The problem is that the defendant doesn't like that because, under their analysis, that's a de minimis use. They're not in the marketplace. Why should we be stopped? We are in the marketplace. We have a fanciful mark that's entitled to, and it's inherently distinctive, and it's out there in the marketplace in all aspects of the recording industry, not just recording records and music. Now, it's important that this analysis was missed here by the lower court. And the lower court said you have to consider the commercial success or the commercial significance of the trademark, regardless of whether it's fanciful or not. That was error. And that should only be reserved for those instances in which distinctiveness is an issue, such as in a trade dress case or in dilution, where famousness and the market analysis is important. Kennedy. You want to save some time for rebuttal? Yes. I'd just like to point out a correction to the briefs that I noticed last night, and that is there's a citation to the excerpt of record on the opening brief at page 47, note 46, that's 144-33, and it should be 140-33. Why don't you fill out a little slip? I will do that. I'd like to finish up and just point out one point before I reserve some time, and that is that proximity, similarity, and market channels are important here. Trade shows overlap. These people are going to see each other. They're going to not only be referred to different aspects of their business, but there's an expansion possibility. Numerous record labels do the same management system that my client does for their own product lines, rather than rely on outside services. It's quite possible that that will happen, and I'll reserve the remainder of my time. Thank you. Thank you. Good morning, Your Honor. My name is David. Good morning, Your Honor. My name is David Kaplan. I'm here on behalf of my clients MQ Communications and Jeff Mosley. With me here is Mark Wildeson. He's here on behalf of his client, Gaylord Entertainment Company, and I'm going to leave him a few minutes to talk about jurisdiction as to Gaylord, because there are two jurisdiction motions filed, one by my client Jeff Mosley, one by his client, Gaylord Entertainment Company, that was not addressed. But I'd like to start with, first, counsel has framed this as a trade name. Who's going to be speaking after you? Mark Wildeson. On behalf of Gaylord Entertainment Company. Okay. I just want to see what a guy from Nashville looked like. Your Honor, I'd like to start with, first, addressing the point that counsel made, this is a trade name case. Trade name cases was addressed, this same exact issue was addressed in the active right case, which said that trade name cases are addressed under 1125A, and they're not based on registration. So in order to establish a trade name case, you actually have to show that you have rights in the mark, and it doesn't flow from a registration. Rights flow from use. The second point that I'd like to start with is the sleek rat factors. There's simply no support in the law at all that in any trade name case you ever ignore the sleek rat factors. The whole point of all the factors is you analyze what's going on in the marketplace. You analyze whether consumers recognize the mark, whether the marks are similar, whether the marketing channels are similar, how consumers view the marks, how careful they are, whether people think people might be expanding into it. It's basically these are guidelines. There are numbers of cases that say, you know, if you have directly competing goods and you've got essentially identical marks, the ballgame is over. Well, there's also the case of cone very recently, which is the same exact, same exact. Everything was the same. But then they said, look, people have been using it for in the marketplace for six years and nobody's been confused. So if nobody's confused, there's no likely confusion. And my point being is that you always go through the process of analyzing. It's not as though they stop. But analyzing the products here, these are not the same markets. We introduced a declaration of Mark, I mean, of Bill Conine, who's a Christian music expert, who talked about the Christian music as a completely separate business. It has its products are have to pass a certain test. People come in. You don't suddenly move into Christian music. There are certain types of we have two associations that actually review the music in order to make sure that it is Christian music. That's appropriate as the content is appropriate for Christian music. And the way this is done, as opposed to general music styles, which we're all familiar with, rap, jazz, folk that are sold in general stores, and you can call your music what you want. Here, this music is defined by lyrical content. So it's a content-specific music as opposed to style. And the point of this is that, one, the markets simply don't overlap. The Christian music is sold in Christian bookstores. With respect to the small amount that's sold in actual stores, that's separated in a separate bin, Christian music bin. And these recordings aren't organized by record label. Nobody goes into a record store saying, I want to buy an M2 record. They go in, I want to buy Bruce Springsteen. I want to buy whatever your favorite band is. Or I want to buy, I heard about this record called this. I want to buy that. Nobody says, I want to buy M2 music records. That just simply doesn't exist. Get into this. That is what your expert testified to. That's what our expert testified to. And that's what there are five or six different cases across the country, district courts have analyzed this, and the same facts come across in every single one of these cases. The Sonnenbling case, these are all cited in our brief. The Tsoulis case, the Q Division case, the judge also found this in the Madison case that you'll hear next. Which brings me to actually one point. I wanted to clarify two things, is that there was no trial in this case. That's the case you'll hear next. And starting off with the sleep drive factors, the strength of the mark factor I think is important to you. And it's not a mechanical test. We're not doing a science test to see whether something is fanciful, arbitrary, suggestive or descriptive. What we're trying to find out is do consumers know about this mark? Are they going to be confused? Because you can only be confused about something you know about. And the evidence here is that, yes, it came up with a mark M2. But as the Court recognizes, there are levels of fanciful marks. One can be, one can come up with a mark like Kodak, which is a new word which means nothing, and that mark is extremely fanciful. Where there's M2 and there's M1s, and in this case there's evidence of other M2s in the marketplace. But one has to examine whether people actually know the mark. And the evidence in this case is that nobody knows the mark. They sold, when they say their recordings were de minimis, if you actually look at the actual evidence set in front of the judge, it was 880 copies of recordings sold over a 13-year period. They made $2,000 on these recordings. This isn't just a small company. This is basically nonexistent. And with respect to their other business, they talk about how they have this large multi-consumer recognition with this software. Well, that's a database software for tracking royalties that the companies use simply to track what payments they owe companies. And the evidence in our case is that they redacted the names of the recordings. They have no evidence of any of these people being confused. They have no testimony from any of them. One of the things that you get from the judge's decision, and that came through in this case, is that there's just simply a lack of evidence for the judge to find in front, for a jury to find in favor of the plaintiff. There's nothing for them to rely upon. The only evidence submitted in our case was by a declaration from Bill Conine and the evidence of what the parties do, which is simply that we're just in entirely different businesses. There's been no market overlap, no advertising in the same businesses. He talked about trade shows. There's evidence about trade shows. There's evidence about what trade shows they appear at and what we appear at. Completely different. No overlap. We've never advertised in the same magazine, never advertised in the same catalog, never appeared at the same conference. Getting to the relate – getting to the – getting to what I think is one of the most important facts in this case is that these parties have been using their marks in the marketplace for three years, and there wasn't a single evidence of confusion. And I understand that the general law is that confusion, actual evidence of confusion is hard to come by. But this isn't a case where a party is selling products to random people across the country, and you may never hear back from them that they're confused. In this case, they license the software to specific companies. They go over that to them, and they actually personally install the software on their systems. Or they work and they process – it's a personal, hand-to-hand business. If one of them thought they were associated with us, or if one of them said, hey, I'm confused, are you offering this Christian music, they would know this. And if our – and if one of their 880 copies, those were also sold. They distributed by hand. I think they sold 120 over Amazon. But the vast majority, to the extent you can say a majority, over 880 recordings were hand-delivered to people. They were handed out to the music industry. People would have told them that they were confused. They would have mentioned this. We've had three years with not a single evidence of any confusion. And moving beyond that, they didn't even do the survey to show that there could be confusion. There's no survey in this case. What it came down to is Judge Mass was faced with a declaration of Bill Klein, which they chose not to challenge, chose not to depose him. And the evidence of what we do, and they chose not to depose our chief manager, the guy who knows about our business, they chose not to develop a case to show that confusion was probable. And that, again, is what counsel concluded in his statement. He said that it's possible that people would be confused. That's not the standard in a likelihood of confusion case. The standard is confusion has to be probable of an appreciable number of consumers. And in this case, there simply aren't enough consumers who could have been confused. And secondly, they failed to show the probability. Let me explore for a second your strength of the mark argument, which is you probably can see, at least conceptually, M2 is a reasonably strong mark. I mean, it's not descriptive. Yeah, we can see it. And then you're saying, now, suppose you have a very, very small music company that sells into exactly the same market as yours. Would you be entitled to say, well, look, there's such small potatoes that we can come in and use the same mark? Well, I think the point is that the market recognition, which is what the commercial strength analyzes, the market recognition is tied in with the relatedness of the goods. So how strong your recognition is beyond what you've done, that goes into how close the products are. In our case, the products are so far apart. Well, I understand that part of your argument. I'm just trying to explore sort of where you are going with the commercial prong of the strength of the mark. I mean, I think it's the analysis that you simply ignore the commercial strength. OK. Is a difficult case to make because then the plaintiff has the same rights as Coke. See, it's different to say. I don't know that we have a case saying that a truly fanciful mark is weakened by a lack of commercial strength. And maybe your argument is that we should, or maybe your argument is that I'm not really talking about reducing the strength of the mark. I'm just talking about whether that mark has had any use in any area where we're going to be. I have two responses to that. Well, three. First, the Brookfield case did mention that fanciful marks are typically strong. And then it mentioned how a mark could be so flabby as to compel a finding of lack of confusion. Second, there are district court cases across the country, one being from New York, a Brockmeyer case, which talked about a mark that was fanciful. The mark was O, and it was suing Oprah for having the O magazine. And the court talked about how they had done nothing. There was no advertising. Nobody had ever sold the product. And so how can consumers be recognized for – how can consumers be confused about a mark that they've never heard about? And then the third thing is – and the third thing is there's the GoTo case, which specifically mentions that that's the way the strength of the mark is analyzed. It's conceptual strength and commercial strength. And McCarthy – McCarthy talks about this and describes it in a way that I think makes perfect sense, is that the conceptual strength part talks about the capacity for a mark to be strong. So if you have a descriptive mark, it's going to be very difficult for consumers to recognize that as a sole source. So you're going to have a lot – you have to have a lot more sales to make it recognized by people. But in our case – but with a fanciful mark, you have to do something to have people recognize it.  880 recordings is not a marketplace business. It's – it's beyond the maps. I mean, this is nonexistent. Okay. And with that, I think I can reserve the floor. All right. Do they know their total is 20? Morning, Your Honors. 20 each is 20. Mark Wilderson on behalf of – No, it's 20 total for both – all of you. Yes, Your Honor. Yeah. Mine will be brief. Mark Wilderson on behalf of the defendant, affiliate Gaylord Entertainment. I think the lack of argument by the appellant shows just how tenuous Gaylord's relationship to this case and to the forum is. This case, from Gaylord's perspective, Gaylord was dismissed on personal jurisdiction grounds on a Rule 12b-2 motion early in the case. And that's the only issue that I'm addressing. Gaylord's involvement in this case is through a subsidiary of a subsidiary of a subsidiary, which entered into a distribution agreement with the co-defendant, M2 Communications. Gaylord sold that word division the month before the lawsuit was filed and several months before it was served with the lawsuit. There is no evidence of any contacts by Gaylord, the defendant in the case below, with the forum, with California. There is no offices, no telephone numbers. Gaylord's not registered to do business. The Gaylord has no bank accounts. This is really a case where the plaintiff is trying to impute the contacts of several layers removed, former subsidiary to Gaylord through just imputation and allegation and no facts. I'm happy to answer any questions the Court has, but there's, looking at the First Amendment complaint, there's not even an alter ego allegation. And the complaint is broadly structured to argue that defendants did something or defendants did something else. There is no allegation of general jurisdiction, sufficient contacts by Gaylord itself, nor are there allegations to support in a finding of specific jurisdiction by Gaylord related to the conduct alleged in this complaint. Scalia. Are you from Nashville? Yes, Your Honor. You don't talk like you're from Nashville. I can if you like, Your Honor. My brother-in-law is from Knoxville, and I've been there and to Memphis. And I was told that the way you get to Nashville, you have to learn to talk through your nose. But I don't detect any Tennessee accent, what you said. But I'll tell him. He, my brother-in-law, likes to put that accent on. It gives him charm. I'll tell him I met someone that spoke clear, plain English from Tennessee. Thank you, Your Honor. All right. Thank you. I rebuttal. Yes, Your Honor. Well, first off, I want to point out that nobody says they want to buy a record label. I'm not sure you would agree with that if you were a publisher of music. You do look at record labels, and that's one of the things that will create the problems in the marketplace. We're looking at related goods and services. Not just whether we compete or not. And the sleek craft factors are not to be addressed in the commercial marketplace. They're looking at the strength of the mark. And if you look at the analysis that M2 Communications has presented to this Court, you have to be huge to stop anybody from using your mark. Because if you aren't huge, you're going to be railroaded by every major multinational on Earth. And that pretty much says it all. Are consumers confused is not the issue. It's whether there's a likelihood of confusion as to affiliation, association, sponsorship, amongst any layer of that marketplace. Not necessarily only the people who walk into a Christian bookstore. By the way, Christian music recordings are sold side-by-side in music stores around the country. With other content. Evidence of other M2s. What do you mean by side-by-side? In the same facility. In the same racks. So you might have Christian music here, you have hip-hop here, you have rock and roll here. They're all in the same building, they're all in the same room. But consumers don't look at record labels. But if I have a Christian music record or CD in my hand and it says M2 on the back, and you're holding a buckethead in your hand and it says M2 on the back, will you think there's a confusion as to affiliation or sponsorship or association between those two labels? Just because they're selling different genre of music? I think not. And I think you would have a big problem telling that to Arista and Columbia, Sony, EMI, and every major huge. In fact, I'll read you a list here. Your argument requires me to posit a consumer who walked into the store and said, I want to buy some Christian music and buckethead. No, it's not. When you see the M2 label on the back of those CDs, do you consider that to be an affiliation? My client has had contracts with BMG, Arista, Warner Brothers, Estevan Enterprises, JVC, Windham Hill, a number of the major record labels and publishers in the country. He's had offices on both sides of the country. And because he's not huge, he should be run over by these people? That's ridiculous. The trademark law does not allow it, and there's nothing in the law that you can find that says that. The strength of a mark does not address the commercial success of a company. As to jurisdiction, the lack of an argument shows how tenuous the case is. Might I ask for another two minutes to respond in light of the fact they went over 20? But if not, the fact is the briefs are set forth. There is a connection between California and Gaylord. The two content media group and the content interactive group were both controlled by Gaylord. They were registered corporations in California doing business in California. My client would have had to sue every division of Gaylord. Instead, it sued Gaylord. So the fact of the matter is there's a connection there. I think that the key point here was made by the defendant in its opposition, and that was when it said we are a nonexistent company. We're a nonexistent company that's been in existence 14 years, seven years of which we've had to litigate over this trademark. And we won't stop, because the law says we're entitled to own it, and we're entitled to prevent others from using it. That's the key in this case, Your Honor. What about the argument we heard that there was no evidence presented of confusion? Actual confusion? The record closed in this case in 2003, Your Honor, in mid-2003. And unless there's a procedure that's available for us to submit additional evidence of confusion over M2 uses in the marketplace, I don't know it. I do know that he made an erroneous statement up here when he said that there are evidence of other M2s. Every M2 that's been in existence in this country has either been sued by us or found to be nonexistent. If they can point to another M2 use in the recording industry that doesn't have a problem with us, they should let us know. We'd be glad to know. The fact of the matter is these companies adopted their name, M2 Communications, an LLC by Jeffrey Moseley, after Viacom won at the district court level in its lawsuit against M2. But before, the Ninth Circuit had the good fortune to reverse. And they won't stop. The underlying decisions that you're addressing today are carbon copies of what Judge Paez wrote on the lower decision below in Viacom. And there were refusals to reverse those, to change those, to alter those, in light of the Ninth Circuit's ruling on that opinion. So that's where we're at here. We're a nonexistent company. That's a big thorn in the side to a lot of lawyers. Thank you, Your Honor. Roberts. Did your side run over time? No, I think we have two minutes left. I thought so. Didn't counsel say you ran over two minutes? Yeah, I think maybe we thought we had ten minutes. You had an opening and a response, and you want a survey bottle, which we don't generally give? Well, I just wanted to address two things. Well, is something new that came up? The jurisdiction as to Moseley, which I didn't address. I just wanted to say we wanted to submit that on the briefs. And if I could just respond to just one quick point, is I think it's important that because this is a new counsel, it wasn't part of the district court, to understand that there is a record here, and there's certain evidence that was before the court, which labels that they licensed to was not part of the record. And the fact that that's part of the district court's decision, as you talked about, how they redacted everything. And they could have submitted a customer list. They didn't. And they just basically didn't develop any evidence in this case. When they talked about people could have one record, could have another, but they didn't develop any of that evidence. That's all conjecture. You can't certainly find that people are likely to be confused. Confusion is probable when you didn't do any work to actually develop that evidence. You're saying counsel went outside the record? All the names of those companies? Companies were not in the record. That's part of the Madison case. That's not part of our record in our case. Thank you, Your Honor. On that we submit. All right. Thank you, Your Honor. You all through now? Yes. Okay. All right. The matter will stand submitted, and we'll take a 10-minute recess. All rise. The court will stand in recess for approximately 10 minutes. Thank you.
judges: Pregerson, Canby, Beezer